RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 10a0186p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

WEDGEWOOD LIMITED PARTNERSHIP I,
              *Plaintiff-Appellee,*

      *v.*

TOWNSHIP OF LIBERTY, OHIO; BOARD OF
TRUSTEES OF LIBERTY TOWNSHIP; ROBERT
MANN, PEGGY GUZZO, and CURT SYBERT, in
their official capacities as Liberty Township
Trustees; and HOLLY C. FOUST, in her official
capacity as Liberty Township Zoning
Inspector,
              *Defendants-Appellants.*

No. 08-4446

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 04-01069—Algenon L. Marbley, District Judge.

Argued: December 4, 2009

Decided and Filed: June 28, 2010

Before: GRIFFIN and KETHLEDGE, Circuit Judges; CARR, District Judge.[*]

_____

### COUNSEL

**ARGUED:** Michael W. Currie, THOMPSON HINE LLP, Columbus, Ohio, for Appellants. Joseph R. Miller, VORYS, SATER, SEYMOUR AND PEASE LLP, Columbus, Ohio, for Appellee. **ON BRIEF:** Michael W. Currie, Scott A. Campbell, O. Judson Scheaf, III, Michele L. Noble, THOMPSON HINE LLP, Columbus, Ohio, Lawrence E. Barbiere, SCHROEDER, MAUNDRELL, BARBIERE & POWERS, Mason, Ohio, for Appellants. Bruce L. Ingram, VORYS, SATER, SEYMOUR AND PEASE LLP, Columbus, Ohio, for Appellee.

    GRIFFIN, J., delivered the opinion of the court, in which KETHLEDGE, J., joined. CARR, D. J. (pp. 21-26), delivered a separate dissenting opinion.

_____

[*]The Honorable James G. Carr, United States District Judge for the Northern District of Ohio, sitting by designation.

1

———————————

**OPINION**

———————————

GRIFFIN, Circuit Judge.  Defendants Township of Liberty, Ohio, its Board of Trustees, and its zoning inspector (collectively the "Township") appeal the district court's order enjoining it from applying a set of zoning instructions against a parcel of property owned by plaintiff Wedgewood Limited Partnership I ("Wedgewood").  This dispute arose more than six years ago, when Wedgewood applied for a zoning certificate to develop a Wal-Mart Supercenter ("Wal-Mart") in Liberty Township's Wedgewood Commerce Center.  The Township's residents rallied against the retail giant, hoping to prevent the store's construction.  Their elected Board of Trustees responded by enacting zoning instructions that adversely affected Wedgewood's ability to develop a large commercial structure on its property.  When Wedgewood's agreement with Wal-Mart collapsed, it filed this civil rights action pursuant to 42 U.S.C. § 1983.

We hold that the Township violated Wedgewood's procedural due process rights when the Township adopted zoning instructions that, in effect, amended the Wedgewood Commerce Center planned unit development without providing Wedgewood with notice and an opportunity to be heard.  Accordingly, we affirm the order of the district court granting a permanent injunction.

I.

On November 18, 1991, the Liberty Township Board of Trustees ("Trustees") legislatively approved the Wedgewood Commerce Center  ("WCC"), a planned unit development ("PUD") in Liberty Township, Ohio.  A PUD is a unique creature of zoning because the entire development carries one nominal zoning classification only, but its subdivisions contain many different kinds of approved land use, including, for example, zoning for single-family dwellings, multi-family units, schools, recreational facilities, and commercial developments.  The zoning restrictions applicable in each PUD subdivision "are ascertainable only by referring to the approved plats for

[] development." *Gray v. Trs. of Monclova Twp.,* 313 N.E.2d 366, 367, 369 n.4 (Ohio 1974).

Leading up to the November 18, 1991, vote, parameters for the WCC's land use were negotiated at length between the Trustees and Charles Ruma & Associates, one of the applicants seeking approval for PUD re-zoning.[1] Before voting to approve the WCC, Trustee John C. Werner asked whether the WCC development plan, as amended, would be "incorporated into a document for the Township records." Mr. David Dye, an attorney for Charles Ruma & Associates, responded, "Yes, it would."

On February 20, 1992, a document was received by, and filed with, the Liberty Township Zoning Commission ("Commission") entitled "Wedgewood Commerce Center - Development Standards." This document contained, among other things, individual development criteria and zoning information for each subdivision, a map labeled "WCC Land Use Plan[,]" and Addendum A, entitled "Wedgewood Commerce Center Summary of Site Data." According to this document (hereinafter "WCC Development Plan" or "WCCDP"), only subareas 3, 8, and 9 were zoned for commercial development.[2]

Nevertheless, between 1992 and 2003, the owners of subareas 4, 5, 6, and 10, plats all originally designated for suburban office use only, sought approval for and obtained permits to build commercial structures. According to the Township, by late 2003, subareas 4, 5, 6, and 10 contained approximately 390,611 square feet of commercial space.

Wedgewood owns lot 2069, designated as subarea 3, a 32.36 acre plat of land in the WCC and the subject of the parties' protracted litigation. According to the WCCDP,

---

[1] Charles Ruma is also the president of Wedgewood. In 1991, Ruma's company, Charles Ruma & Associates, applied to re-zone a 345-acre plat of vacant land from "farm residential" to PUD to develop the WCC.

[2] Since it was filed with the Commission, the WCCDP has governed the permissible zoning in the WCC. Liberty Township's zoning inspector, Holly Foust, as well as her predecessor, referred to the WCCDP as the WCC "official book[.]" The WCCDP is also labeled, in handwritten script on the front page, "Official Book[.]"

subarea 3 is zoned for commercial development and is allotted a maximum of 220,857 square feet of commercial building space. The square footage of subareas 3, 8, and 9, when combined, permit a total of 499,930 square feet of commercial development in the WCC.[3]

At a public Trustees meeting in September 2003, a resident of Liberty Township voiced her "concern[]" about "rumors" that a Wal-Mart or Lowe's was moving into the WCC, asserting that the development was becoming too "commercial." The resident asked Trustee Werner, "can we do anything about it?" He replied, "those hearings were . . . years ago, and the public had their shot then, and basically [the WCCDP] was approved."

The rumors proved to be true. In October 2003, Wedgewood submitted an application to the Commission requesting an amendment to the WCCDP, specifically, six zoning variances to develop a 227,825 square foot Wal-Mart and fueling station on subarea 3.[4] While its variance application was pending, Liberty Township residents contacted the Commission to express their objection to the proposed Wal-Mart. On October 22, 2003, the Commission held a public hearing addressing Wedgewood's application. After considering statements from several residents, many of whom were opposed to the Wal-Mart, the Commission denied Wedgewood's application for an amendment to the WCCDP that would allow subarea 3's commercial development to exceed 220,857 square feet.

Over the next several months, public opposition to the Wal-Mart intensified. To address the public's concerns, the Trustees held two public meetings on December 1 and 15, 2003. Trustee Peggy Guzzo also coordinated "petition drive[s]" gathering "a total

---

[3]According to the WCCDP, subarea 8 is a 21.18 acre plat of land zoned for commercial use and is allotted a maximum of 144,553 square feet of commercial building space. Subarea 9, a 19.71 acre plat, is also zoned for commercial land use and permits 134,520 square feet of commercial building space. The total acreage of subareas 3, 8, and 9 is 73.25 acres.

[4]Wedgewood sought these variances, in part, because subarea 3 permitted only 220,857 square feet of commercial development. The proposed Wal-Mart, however, would require an additional 6,968 square feet of commercial space. Thus, Wedgewood needed an amendment to the WCCDP zoning map to build a commercial structure on subarea 3 that exceeded its allotted square footage.

of 1,150 signatures" from anti-Wal-Mart residents. After these meetings, the Trustees asked Liberty Township's zoning inspector, defendant Holly Foust, to produce a report detailing the prior zoning certificates issued by the Commission and the combined square footage of all commercial structures located in the WCC.

On January 19, 2004, the Trustees issued a "Public Statement and Instructions to Zoning Department Regarding Future Administration of Wedgewood Commerce Center Development Plan" (hereinafter "Instructions"). These Instructions, which form the crux of Wedgewood's constitutional claims, state, in relevant part:

> On a general basis, we have certainly heard our constituents' requests and desires to do what is possible to deter excessive and regional types of commercial development in our community. As a Board we, like other residents in our community, are interested in employing our current regulations, and developing and adopting new regulations, to avoid, as possible, and limit, where possible, the burdens that "big box" types of retail facilities place upon the infrastructure of our community.

> * * *

> Extensive review and analysis of the Wedgewood Commerce Center development plan, the minutes of the meetings which led to the approval of that plan, the policies that have been followed to date in administering that plan, and the discernable intent of all of the parties expressed during the conception and the process which led to the approval of the plan, has led us to conclude that the ultimately adopted plan imposed a "floating" maximum of 500,000 sq. ft of "commercial" development in the Wedgewood Commerce Center. We have found evidence of the establishment of this limit in a number of different documents. Moreover, we have found no documents or proof through amendment processes which modified this "overall" square footage cap, as best as we can conclude. The subject of whether or not an acreage "cap" also applies has been more difficult.

> * * *

> The analysis reveals that the commercial development completed to date, and substantially through the approval process, has consumed most of the commercial square footages [sic] imposed by the development plan as an overall cap.

> * * *

> Under these circumstances, we have determined that, except for a few modest projects which have already completed the two-step "major" administrative review process, all additional applicants seeking to construct retail or other arguable "commercial" development in the Wedgewood Commerce Center will be required to seek approval as a "major" plan of modification. In other words, we are instructing our zoning department to refrain from issuing zoning certificates for any additional commercial development in the Wedgewood Commerce Center, to issue such permits only after an approval through the "two-step" major process has been completed. Each process will be considered to be an application to consume any remaining portion of the square footage limitation, or exceed that limitation, and as a modification to expand the acreage limitation which we believe has been met.

Six months later, Wedgewood filed its application with the Commission for a zoning permit to build a smaller, approximately 220,598 square foot Wal-Mart and fueling station on subarea 3. Unlike its October 2003 application, Wedgewood did not seek a variance to permit construction that surpassed subarea 3's 220,857 square feet of approved commercial space. Wedgewood did not submit its application as a major plan of modification, as specified in the newly adopted Instructions.

On September 30, 2004, the Commission denied Wedgewood's application for a zoning certificate. In its denial letter, the Commission stated that the Instructions were "made a part of [the Commission's] decision by [] reference" and articulated several reasons for denying the permit, including: (1) failure to meet the "requirements of the currently effective [WCCDP]"; (2) "exceed[ing] the maximum allowable commercial acreage and [500,000] square footage limitation[] that were expressly made a part of the development plan"; (3) failure to obtain WCC architectural review committee approval; and (4) inconsistencies with the governing Liberty Township Zoning Resolution. Wedgewood appealed the Commission's denial of its zoning certificate to the Liberty Township Board of Zoning Appeals ("BZA"). This appeal ("BZA I") preceded the ongoing state-court proceedings that have paralleled Wedgewood's federal litigation.

On November 5, 2004, before the BZA decided BZA I, Wedgewood filed the present action pursuant to 42 U.S.C. § 1983 in the United States District Court for the Southern District of Ohio. Wedgewood's federal complaint alleged, *inter alia*, that the

Trustees' adoption of the Instructions constituted an unauthorized amendment to the WCCDP, violating its state and federal due process rights, or, in the alternative, that the WCCDP was unconstitutionally vague.  Several local homeowner associations intervened and joined the Township's efforts to dismiss Wedgewood's federal complaint.  The application of various abstention doctrines was one of many arguments advanced by the Township and interveners.  Thereafter, the district court granted in part and denied in part the parties' Fed. R. Civ. P. 12(b)(6) motions and rejected their arguments for abstention.

Subsequently, the parties filed cross-motions for summary judgment.  In September 2008, almost five years after Wedgewood first applied to construct the Wal-Mart, the district court granted its motion for summary judgment with respect to its vagueness and procedural due process claims.  The district court's constitutional rulings were dependant upon its finding that the Instructions amended the WCCDP without providing Wedgewood with advanced notice and a hearing in violation of Ohio Rev. Code § 519.12.  The district court's order enjoined the Township from enforcing the Instructions and, in particular, the 500,000 square foot floating cap (hereinafter "floating commercial cap") against Wedgewood's property.  The Township timely appeals.

II.

We have jurisdiction to decide this interlocutory appeal pursuant to 28 U.S.C. § 1292(a)(1) because the district court entered a permanent injunction against the Township.  As a general rule, our jurisdiction is confined to the issues necessary to determine the propriety of the district court's injunction.  *See Gibson Guitar Corp. v. Paul Reed Smith Guitars, LP*, 423 F.3d 539, 545 (6th Cir. 2005);  *Chambers v. Ohio Dep't of Human Servs.,* 145 F.3d 793, 797 (6th Cir. 1998); 16 Arthur R. Miller, Edward H. Cooper, Vikram David Amar, *Federal Practice & Procedure* § 3921.1 (2d ed. 1996 & 2009 Supp.).

Because the scope of our jurisdiction is limited by § 1292(a)(1), we may not reach the Township's arguments challenging the district court's abstention ruling.  The district court's refusal to abstain is embodied in its order granting in part and denying

in part the Township's motion to dismiss, an order that is not presently before us. *See Summers v. Leis*, 368 F.3d 881, 889 (6th Cir. 2004). In this regard, we reject the Township's perfunctory argument that the district court's abstention ruling is "inextricably intertwined" with its order granting injunctive relief. *See United States v. Phinazee*, 515 F.3d 511, 520 (6th Cir. 2008) (holding that a party forfeits an issue that is "adverted to . . . in a perfunctory manner unaccompanied by some effort at developed argument.").

> In *Summers*, we described the narrow scope of our pendent appellate jurisdiction:
>
> Pendent appellate jurisdiction refers to the exercise of jurisdiction over issues that ordinarily may not be reviewed on interlocutory appeal, but, may be reviewed on interlocutory appeal if those issues are "inextricably intertwined" with matters over which the appellate court properly and independently has jurisdiction. *Chambers v. Ohio Dep't of Human Servs.*, 145 F.3d 793, 797 (6th Cir. 1998). This circuit has interpreted "inextricably intertwined" to mean that the resolution of the appealable issue "necessarily and unavoidably" decides the nonappealable issue.

368 F.3d at 889 (some internal citations omitted).

"The 'inextricably intertwined' requirement of pendent appellate jurisdiction is not meant to be loosely applied as a matter of discretion; rather, such jurisdiction only may be exercised when the appealable issue at hand cannot be resolved without addressing the nonappealable collateral issue." *Chambers,* 145 F.3d at 797 (citing *Archie v. Lanier*, 95 F.3d 438, 443 (6th Cir.1996)). Moreover, we have previously declined to exercise our pendent appellate jurisdiction over a district court's abstention ruling when the resolution of that issue "require[s] the application of [a] separate and distinct legal standard[.]" *Summers*, 368 F.3d at 889. Such is the case here. Because we are able to resolve the propriety of the district court's injunction without reaching its abstention ruling, we decline to review it. *See Chambers*, 145 F.3d at 797.

Despite its status as the appellant, the Township also argues that the issues raised by this appeal are moot. "Simply stated, a case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Ford*

*v. Wilder*, 469 F.3d 500, 504 (6th Cir. 2006) (quoting *Powell v. McCormack*, 395 U.S. 486, 496 (1969). "The test for mootness is whether the relief sought would, if granted, make a difference to the legal interests of the parties." *Ford*, 469 F.3d at 504 (citation and internal quotation marks omitted).

The Instructions, as applied to the WCCDP, affect the permissible zoning in subarea 3. Specifically, the floating commercial cap provision and the major modification procedure will continue to inhibit Wedgewood's ability to develop a maximum of 220,857 square feet of commercial space on its property. Thus, contrary to the Township's position, the evaporation of Wal-Mart's offer to purchase subarea 3 does not extinguish Wedgewood's legally cognizable interest in securing a judgment that enforces its right to develop its property according to the WCCDP zoning as it existed before the Instructions.

In this regard, our mootness analysis highlights a key distinction between Wedgewood's federal and state litigation. Wedgewood's state court proceedings challenge the zoning inspector's denial of its application for a zoning certificate to develop a 220,598 square foot Wal-Mart on subarea 3. In contrast, Wedgewood's federal litigation involves its claim that the Trustees violated its procedural due process rights by enacting the Instructions without notice and a public hearing. Although each proceeding requires an interpretation of the WCCDP, the harm alleged and the relief sought are distinct.

III.

"A party is entitled to a permanent injunction if it can establish that it suffered a constitutional violation and will suffer 'continuing irreparable injury' for which there is no adequate remedy at law." *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson County*, 466 F.3d 391, 394 (6th Cir. 2006) (citing *Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 602 (6th Cir. 2006). "In determining whether a district court has properly granted a permanent injunction, we review factual findings for clear error, legal conclusions de novo, and the scope of injunctive relief for abuse of

discretion." *Gibson Guitar Corp.*, 423 F.3d at 546 (internal citation and quotation marks omitted).

In the usual course, a district court should conduct an evidentiary hearing before issuing a permanent injunction. *Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1174 (6th Cir. 1995). However, because "no factual issues remain[ed] for trial, the district court's decision to grant a permanent injunction without such a hearing [can] still be upheld" if it properly granted summary judgment for Wedgewood. *See Gibson Guitar Corp.,* 423 F.3d at 546 (internal citation and quotation marks omitted). Accordingly, resolution of the Township's appeal from the district court's permanent injunction requires us to analyze the district court's summary judgment rulings as to Wedgewood. *Id.*

Summary judgment should be granted whenever "there is no genuine issue as to any material fact and [] the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Thus, only disputed material facts, those "that might affect the outcome of the suit under the governing law[,]" will defeat summary disposition. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In addition, the standard of review applicable to cross-motions for summary judgment does not differ from the standard we apply when reviewing a Fed. R. Civ. P. 56(c) motion filed by only one party. *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991).

To establish a procedural due process violation under 42 U.S.C. § 1983, Wedgewood is required to demonstrate three elements: (1) that it had a life, liberty, or property interest protected by the Due Process Clause of the Fourteenth Amendment; (2) that it was deprived of that protected interest within the meaning of the due process clause; and (3) that the state did not afford it adequate procedural rights before depriving it of its protected interest. *See Med. Corp., Inc. v. City of Lima*, 296 F.3d 404, 409 (6th Cir. 2002).[5]

---

[5]Procedural due process and vagueness claims brought under the Ohio Constitution are governed by the same legal standards applicable to the federal constitution. *Sorrell v. Thevenir*, 633 N.E.2d 504, 511 (Ohio 1994); *Warren v. City of Athens, Ohio,* 411 F.3d 697, 704 n.6 (6th Cir. 2005). Thus, we analyze Wedgewood's state and federal constitutional claims simultaneously.

Wedgewood will prevail on its procedural due process claim if it: (1) demonstrates that it was deprived of a liberty or property interest as a result of an "established state procedure[,]" which itself violates procedural due process rights; or (2) establishes that the Township deprived it of a liberty or property interest "pursuant to a random and unauthorized act" and available state remedies would not adequately compensate it for the loss that it suffered. *Mertik v. Blalock*, 983 F.2d 1353, 1365 (6th Cir. 1993); *see Macene v. MJW, Inc.*, 951 F.2d 700, 706 (6th Cir. 1991).

A.

Because the district court's injunction turned on its conclusion that the Instructions improperly amended the WCCDP, we begin our analysis with this ruling. The parties agree that Ohio law governs our interpretation of the WCCDP. *See*, *e.g., Miamisburg v. Wood,* 739 N.E.2d 410, 412 (Ohio Ct. App. 2000) (relying upon Ohio law to interpret an Ohio city ordinance).

When interpreting zoning ordinances, or, in this instance, the WCCDP, we must presume that the WCCDP and Instructions "mean what [they] say[]." *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 129 S. Ct. 1862, 1868 (2009) (Stevens, J., concurring). In addition, our "interpretation of [the WCCDP] should serve to illuminate its meaning, rather than to render portions of it meaningless." *Cardani v. Olsten Home Healthcare*, No. 97AP1200833, 1998 WL 549374, at *3 (Ohio Ct. App. July 31, 1998).

> Article XIV of the Liberty Township Zoning Resolution § 14.06(F) states:
>
> Any significant changes to an Approved Development Plan in a Planned Commercial and Office District shall be considered an Amendment to the Zoning Map and shall only be made in accordance with Article XXVII of this Resolution. [6]

Article XXVII of the Liberty Township Zoning Resolution "is . . . a restatement of Section 519.12 of the Revised Code of Ohio[,]" which requires advanced notice and a

---

[6]Notably, this provision appears directly below Article XIV subpart F, which specifically addresses subdivided plats in PUD developments.

public hearing before the Trustees can adopt an amendment to an existing PUD development plan.

The Township asserts that the district court erred when it ruled that the Instructions constituted an amendment to the WCCDP rather than a clarification of its existing restrictions, including the floating commercial cap. It contends that the true amendment occurred on November 18, 1991, when the Trustees voted to restrict the WCCDP to 1,000,000 square feet of office space, 500,000 square feet of commercial space, and 750 residential units. According to the Township, the 500,000 square foot floating commercial cap is reflected in the following November 15, 1991, amendment to the WCCDP:

> B.      *Subarea Development Criteria*
>
> 1.      Criteria Generally
>
> a)      Density
>
> * * *
>
> 3)      Commercial. Gross square footage of commercial construction shall not exceed Five Hundred Thousand (500,000) square feet.

The Township also claims that the floating commercial cap is memorialized in Addendum A of the WCCDP:

WEDGEWOOD COMMERCE CENTER
SUMMARY OF SITE DATA

| I. | TOTAL LAND USE | ACRES | MAX: GROSS BLDG AREA | DENSITY |
|---|---|---|---|---|
| | COMMERCIAL | 73.26 AC | 500,000 S.F. | 6,825.00 SF/AC |
| | OFFICE | 114.68 AC | 1,000,000 S.F. | 8,719.92 SF/AC |
| | RESIDENTIAL | 104.14 AC | | |

The Township further maintains that the floating commercial cap is recorded in the November 18, 1991, Trustees meeting notes, wherein it was mentioned that the WCC would contain "500,000 square feet of commercial development."

In response, Wedgewood concedes that the WCCDP reflects a total gross building area of 500,000 square feet of commercial space. It counters, however, that a floating cap on commercial development was never contemplated by the parties. According to Wedgewood, any WCC document that reports a total of 500,000 square feet of commercial space simply reflects a summary of the WCCDP's approved commercial land use in subareas 3, 8, and 9 only.

We agree with Wedgewood's interpretation of the WCCDP. Accepting the Township's position, i.e., that Addendum A's reference to a "max. gross bldg. area" of 500,000 square feet reflects the parties' intent to apply a floating commercial cap to all subdivisions within the WCC would render meaningless the WCCDP's express designation of subareas 3, 8, and 9 as the only commercial subareas. Put another way, if commercial development were permissible or intended in subareas other than subareas 3, 8, or 9, it would have been superfluous to assign a specific land use category to each subarea. In addition, the Township's interpretation of the WCCDP would require us to ignore the strong correlation between Addendum A's reported 500,000 square feet of commercial building space and the combined square footage of subareas 3, 8, and 9, which totals 499,930 square feet.

Moreover, Addendum A's density calculation is telling. It divides 500,000 square feet of gross commercial building space by a total acreage area of 73.26 acres, the total acreage of subareas 3, 8, and 9 (within one-hundredth of one point), for a total density of 6,825 square feet of commercial space per acre. Thus, Addendum A

specifically configures its commercial density calculation by dividing the total amount of commercial building space permitted in those subareas with the total acreage of subareas 3, 8, and 9. This calculation directly contradicts the Township's claim that the 500,000 square feet of approved commercial development within the WCC was not specifically tethered to subareas 3, 8, and 9.

We conclude, as the district court did, that the WCCDP, as amended, contemplated commercial development in subareas 3, 8, and 9 only; therefore, there was no "floating" commercial cap in the WCCDP before the enactment of the Instructions. In this regard, we agree with the district court's conclusion that, even though the Township and Wedgewood "turn[ed] a blind-eye toward the [specific] location requirements for commercial development expressed in the [WCCDP] for thirteen years[,] [it] does not somehow change the maximum allowable commercial development [permitted] in subareas 3, 8, or 9."

The Township's enactment of the floating commercial cap provision, as articulated in the Instructions, effectively reduced the total square footage of commercial space permitted in subarea 3. We therefore hold that the Instructions constituted a "significant change[] to an approved Development Plan[,]" thus requiring an "Amendment to the Zoning Map[.]" *See* Liberty Township Zoning Resolution § 14.06 (F).

For these reasons, we conclude that the district court did not err in ruling that the Instructions constituted an amendment to the WCCDP that triggered Ohio Rev. Code § 519.12's advance notice and public hearing requirements.

B.

Next, the Township argues that the district court erred in ruling that Wedgewood had a protected liberty interest in the amendment procedures discussed above. Wedgewood, however, has abandoned the district court's liberty-based analysis and requests that we affirm the district court's favorable ruling on its procedural due process

claim on the separate ground that it had a property interest in subarea 3's zoning before the Trustees enacted the Instructions.[7]

"Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law – rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Bd. of Regents of State Colls. v. Roth,* 408 U.S. 564, 577 (1972).

"In determining whether [Wedgewood] established a vested property interest, we must look to substantive state zoning laws." *Dorr v. City of Ecorse*, 305 F. App'x 270, 275 (6th Cir. 2008) (unpublished) (citing *Silver v. Franklin Twp. Bd. of Zoning Appeals*, 966 F.2d 1031, 1036 (6th Cir. 1992)). In *Silver*, we stated that a party obtains a protected property right under the Fourteenth Amendment when it can demonstrate a "'legitimate claim of entitlement' or a 'justifiable expectation' in the approval of his [building] plan." *Silver*, 966 F.2d at 1036 (citations and quotation marks omitted).

In Ohio, it is well-established that a landowner's right to an existing zoning classification vests upon his submission of an application for a building or zoning certificate. *Gibson v. Oberlin*, 167 N.E.2d 651, 654 (Ohio 1960). However, vesting does not occur unless the

> property owner has complied with all the legislative requirements for the procurement of a building permit and his proposed structure falls within the use classification of the area in which he proposes to build it, [– if these conditions are met] he has a right to such permit, and there is a duty on the part of the officer charged therewith to issue it.

---

[7]In its appellate brief, Wedgewood requests this court to review its case "under the property wing of procedural due process." Moreover, Wedgewood has not provided a liberty-based argument for our consideration and has therefore forfeited the issue. *See Phinazee*, 515 F.3d at 520 (holding that a party forfeits an issue that is "adverted to in a perfunctory manner unaccompanied by some effort at developed argument").

*Zaremba Dev. Co. v. Fairview Park,* 616 N.E.2d 569, 571 (Ohio Ct. App. 1992) (quoting *Gibson*, 167 N.E.2d at 654).[8]

It is uncontested that Wedgewood submitted its application for a zoning certificate on June 29, 2004, after the Trustees adopted the Instructions. Because Wedgewood submitted its application post-Instructions, the Township argues that Wedgewood cannot demonstrate a vested property interest in its zoning classification under *Gibson* and *Zaremba Dev. Co.* We disagree.

The salient issue before us "is whether the Zoning Commission had the authority under Ohio law to take the action that it did." *Stile v. Copley Twp.*, 115 F. Supp. 2d 854, 865 n.21 (N.D. Ohio 2000). In *Stile*, a zoning commission eliminated a formerly permitted land use classification in a PUD where the plaintiff owned property. *Id.* at 859. The plaintiff intended to sell a section of his property to an automobile dealership, but the sale collapsed when the parties discovered that the township's zoning commission had eliminated the "community/regional sales" zoning classification as a "permitted use" in the PUD. *Id.*

The *Stile* court ruled that the plaintiff had demonstrated a protected property interest in the "community/regional sales" zoning classification because:

> the change made . . . by action of the Township Zoning Commission was in the nature of a zoning amendment . . . . [and the] action was beyond the scope of the Zoning Commission's authority, since the legislative action of amending a zoning classification can only be taken by the Township Board of Trustees after following the notice and hearing procedures set forth in Ohio Rev. Code § 519.12.

*Stile*, 115 F. Supp. 2d at 865 (footnote omitted). Like the Township here, the township in *Stile* asserted that the plaintiff did not have a vested property interest in the existing zoning classification under *Zaremba Dev. Co. Id.* at 865. The district court characterized the township's argument as "a red herring[,]" noting that the proper issue was whether the zoning commission had the authority to eliminate the zoning

_____

[8]It is unclear under Ohio law whether Wedgewood's October 2003 application qualifies as a building permit under *Gibson* and *Zaremba Dev. Co.*

classification without complying with § 519.12's notice and hearing requirements. *Id.* The district court concluded that the zoning commission's actions were improper and granted the plaintiff's request for injunctive relief. *Id.* at 866.

In *SuperValu Holdings, Inc. v. Jackson Ctr. Assocs., LP*, Nos. CA2005-09-085, CA2005-09-089, 2006 WL 1843588, at *4 (Ohio Ct. App. July 3, 2006), the Ohio Court of Appeals acknowledged the property right discussed in *Stile*:

> In *Stile*, a township zoning commission eliminated a "permitted use" in a Planned Development District where the plaintiff owned property. *Id.* at 858-859. The plaintiff had intended to sell part of his property to an automobile dealership, but such a sale was not feasible following the elimination of "community/regional sales" as a "permitted use." *Id.* In *Stile*, state action affected the plaintiff's property rights by restricting how the plaintiff could use his property.

*Id.* at *4. Although *SuperValu Holdings, Inc.*, does not expressly adopt *Stile*'s holding, it acknowledged that a protectable property interest can arise under Ohio law when a government entity restricts a landowner's ability to use his property. *Id.* The facts in *Stiles* are similar to the facts in this case.

For these reasons, we conclude the Ohio courts would hold that, consistent with *Roth, Silver, Stile*, and *SuperValu Holdings, Inc.*, Wedgewood had a "justifiable expectation" that its zoning classification – its right to develop up to 220,857 square feet of commercial space on subarea 3 – was vested unless or until the Commission and Trustees passed an amendment to the WCCDP comporting with the notice and hearing requirements set forth in Ohio Rev. Code § 519.12. *See Silver*, 966 F.2d at 1036 (quoting *Roth*, 408 U.S. at 577, and *Olim*, 461 U.S. at 245); *Dorr,* 305 F. App'x at 275. Specifically, Articles XIV § 14.06 (F) and XXVII of the Liberty Township Zoning Resolution, Ohio Rev. Code § 519.12, and the WCCDP itself, provided the "rules" and "understandings" under Ohio law "that secure[d] . . . [its] claim[] of entitlement" to its zoning classification. *See Roth*, 408 U.S. at 577. Similar to the plaintiffs in *Stile*, Wedgewood possessed a protected property interest in subarea 3's zoning, notwithstanding the Trustees' *ultra vires* amendment. *See generally, Cole v. Twp.*

*of Clinton*, No. 17-91-6, 1991 WL 274246, at *4 (Ohio Ct. App. Dec. 19, 1991) (unpublished).

## C.

Finally, we must analyze whether the Township's enactment of the Instructions without providing notice and a hearing deprived Wedgewood of a protected property interest within the meaning of the Due Process Clause. In this regard, it is well-established that violations of state law do not "automatically translate into a deprivation of procedural due process under the United States Constitution." *DePiero v. City of Macedonia*, 180 F.3d 770, 788 (6th Cir. 1999). The Supreme Court has described "the root requirement" of the Due Process Clause as notice and an opportunity to be heard before one is deprived of a significant property interest. *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 542 (1985).

In *Nasierowski Bros. Inv. Co. v. City of Sterling Heights,* 949 F.2d 890 (6th Cir. 1991), a plaintiff-landowner claimed that the city counsel violated his procedural due process rights by enacting a zoning amendment designed to prevent him from proceeding with his proposed commercial development. *Id.* at 891. The district court granted summary judgment in favor of the city and denied the landowner's request for an injunction prohibiting the enforcement of the new zoning ordinance against his property. *Id.* at 893. We reversed, holding that the landowner "was not provided with notice of a proposed change in the zoning ordinance, a change that would exert a severely detrimental impact on his ability to use the property in a manner consistent with his legitimate expectations – expectations that the City, itself, had encouraged." *Nasierowski Bros. Inv. Co.*, 949 F.2d at 895. We held:

> Governmental determinations of a general nature that affect all equally do not give rise to a [Constitutional] due process right to be heard. But, when a relatively small number of persons are affected on individual grounds, the right to a hearing is triggered. Falling into that latter category is the situation where, during the [zoning] amendment process, a governmental unit singles out and specifically targets an individual's property for a zoning change . . . .

* * *

> Thus, in these circumstances [the plaintiff-landowner] had a right to notice and hearing prior to [the] Council's vote on [the] proposed amendment. The City's failure to afford [the plaintiff-landowner] an opportunity to be heard constituted a denial of procedural due process.

*Nasierowski Bros. Inv. Co.,* 949 F.2d at 896 (footnote omitted).

We find the reasoning of *Nasierowski Bros. Inv. Co.* persuasive. Here, there is ample evidence in the record to support the district court's conclusion that the Instructions were not "general [in] nature[,]" but rather targeted or singled-out Wedgewood's ability to construct a Wal-Mart on its property. *Nasierowski Bros. Inv. Co.,* 949 F.2d at 896. Thus, to satisfy the Due Process Clause, the Township was required to apprise Wedgewood of the pendency of the Instructions and provide adequate notice and an opportunity to present their objections. *DePiero*, 180 F.3d at 788. The Township failed to do so.

Accordingly, we hold that the Instructions, which purported to clarify the WCCDP, unlawfully amended it without affording Wedgewood adequate notice and a hearing in violation of the Due Process Clause and Ohio Rev. Code § 519.12.

We also conclude that the Trustees' enactment of the Instructions constituted "an established state procedure" that itself violated Wedgewood's procedural due process rights. An "established state procedure" is defined as "the mechanism that effects a deprivation or contributes to cause a deprivation[.]" *Vinson v. Campbell County Fiscal Court*, 820 F.2d 194, 199 (6th Cir. 1987) (citation and internal quotation marks omitted). In *Zinermon v. Burch*, 494 U.S. 113, 132-39 (1990), the Supreme Court stated that a government act constitutes "an established state procedure" when officials with the authority to supply a hearing fail to provide one even though they should have foreseen the need to provide such procedural protections. *See also Harris v. City of Akron*, 20 F.3d 1396, 1401-02 (6th Cir. 1994); Erwin Chemerinsky, *Federal Jurisdiction*, § 8.9 at 581 (5th ed. 2007). Here, the Commission and Board of Trustees are the government

entities that should have foreseen, and could have provided, the exact procedural protection that Wedgewood claims it was denied.

IV.

We conclude that the district court properly granted summary judgment in favor of Wedgewood on its procedural due process claim.[9] *Dixon v. Clem*, 492 F.3d 665, 673 (6th Cir. 2007) ("[W]e may affirm on any grounds supported by the record even if different from the reasons of the district court.") (citation and internal quotation marks omitted). Further, we affirm the permanent injunction because Wedgewood suffered a constitutional violation and will continue to suffer irreparable injury for which there is not an adequate remedy at law, *Deja Vu of Nashville, Inc.*, 466 F.3d at 394, and that the scope of the district court's injunction does not constitute an abuse of discretion, *Gibson Guitar Corp.*, 423 F.3d at 546.[10]

For these reasons, we affirm the district court's order granting a permanent injunction against the Township.

---

[9]Because we hold that the district court properly granted summary judgment in favor of Wedgewood on its procedural due process claim, our holding is sufficient to affirm the district court's permanent injunction. Thus, we do not reach the district court's alternate holding that the WCCDP is unconstitutionally vague. *See United States v. Elkins*, 300 F.3d 638, 647 (6th Cir. 2002) ("Courts should avoid [deciding] unnecessary constitutional questions." (citing *Spector Motor Serv., Inc. v. McLaughlin*, 323 U.S. 101, 105 (1944)).

[10]We reserve judgment regarding whether the Township may re-enact the Instructions or their equivalent if it affords Wedgewood adequate notice and a hearing.

———————————

**DISSENT**

———————————

JAMES G. CARR, District Judge, dissenting. Because my understanding of the law controlling an aspect of the case before us differs from that of the majority, I respectfully dissent.

The Due Process Clause of the Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property without due process of law." U.S. Const. Amend. XIV, § 1. To establish a procedural due process violation under 42 U.S.C. § 1983, Wedgewood must show that "'(1) [it] had a life, liberty, or property interest protected by the Due Process Clause; (2) it was deprived of this protected interest; and (3) the state did not afford [it] adequate procedural rights prior to depriving [it] of the property interest.'" *Waeschle v. Dragovic*, 576 F.3d 539, 544 (6th Cir. 2009) (quoting *Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 611 (6th Cir. 2006)); *see also Med. Corp. v. City of Lima*, 296 F.3d 404, 409 (6th Cir. 2002).

"To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead have a legitimate claim of entitlement to it." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972).

In sum, "a party cannot possess a property interest in the receipt of a benefit when the state's decision to withhold the benefit is wholly discretionary." *Med. Corp.*, 296 F.3d at 409. To assert a property interest, a party must point to a "policy, law, or mutually explicit understanding that both confers the benefit and limits the discretion of the City to the rescind the benefit." *Id.* at 410.

"Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Roth*, 408 U.S. at 577.

In Ohio, a property owner's right to an existing zoning classification vests "upon the filing of the application for the [building or zoning] permit." *Gibson v. City of Oberlin*, 167 N.E.2d 651, 654 (Ohio 1960); *Zaremba Dev. Co. v. City of Fairview Park*, 616 N.E.2d 569, 571 (Ohio Ct. App. 1992).

Wedgewood did not have an application for a zoning permit or certificate pending at the time the Trustees enacted the Instructions. The Commission denied Wedgewood's variance application and Wedgewood subsequently withdrew it prior to the Trustees' enactment of the Instructions.

The parties do not dispute that Wedgewood submitted its second application for a certificate on June 29, 2004, after the Trustees enacted the Instructions.

Because Wedgewood did not have an application pending at the time of the amendment, it did not, under *Gibson* and *Zaremba*, have a vested property interest in the zoning classification of the parcel at issue.

I understand the majority opinion to hold that Articles XIV § 14.06 (F) and XXVII of the Liberty Township Zoning Resolution, Ohio Rev. Code § 519.12, and the WCCDP itself, with the accompanying notice and hearing requirements, create a property interest in the zoning classification. This is so, the majority indicates, because the procedural requirements which the corresponding legislative bodies prescribe serve as a "limit on discretion" sufficient to create procedural due process rights and, *ergo*, a property interest results.

Limits on discretion create property interests, according to my understanding, only when those limits are substantive. *Experimental Holdings, Inc. v. Farris*, 503 F.3d 514, 520 (6th Cir. 2007) ("state procedural requirements cannot be the types of "limits on discretion" that are sufficient to find a property interest. In order for limits on discretion to create property interests, they must be *substantive* limits on discretion.") (emphasis in original). State procedural requirements are not sufficient. *Id.*; *see also Ziegler v. Aukerman*, 512 F.3d 777, 787 (6th Cir. 2008) (holding that failure to provide a procedure required by state law does not inherently amount to a federal due process

violation); *Brown v. City of Ecorse*, 322 F. App'x 443, 446 n.7 (6th Cir. 2009) (unpublished disposition) ("[Plaintiff] could not bootstrap himself into Fourteenth Amendment protection by claiming a property interest in certain procedures that he charges were not followed by [defendant].").

The fact that the state provides procedural rights, such as notice and a hearing, to protect substantive rights does not change this fact. *Experimental Holdings*, 503 F.3d at 520. For example:

> There would be a substantive limit on discretion if, for instance, a state could not refuse to renew a certain occupational license unless the licensee overcharged customers. The fact that the state gives the licensee certain procedural rights in determining the substantive right (e.g., an oral hearing, appointed counsel, or two administrative appeals) does not turn those procedural rights into federal due process rights. Nor could it, without simply rendering state procedural law enforceable in federal court.

*Id.*

In the district court case relied on by the majority, *Stile v. Copley Twp.*, 115 F. Supp. 2d 854, 865 (N.D. Ohio 2000), the court held that a zoning commission's amendment of the zoning code violated due process because the township had not provided adequate notice and hearing procedures. *Id.*

In a footnote – and in response to defendants' argument that plaintiff's rights had not vested under *Zaremba* because he had not "compl[ied] with all the legislative requirements for the procurement of a [zoning certificate]" – the court in *Stile* found "the argument of defendants to be no more than a red herring." *Id.* at 865 n.21. The court stated "here, the issue is whether the Zoning Commission had the authority under Ohio law to take the action that it did." *Id.*[1]

---

[1]I note parenthetically that immediately preceding the quote on which the majority relies, the court in *Stile* also stated in response to defendants' argument:

> However, the Township Zoning Regulations also require action on an application within 30 days. The township has offered no explanation as to why the Zoning Inspector chose to sit on the application rather than extending the applicant the courtesy of a telephone call to tell him that his application was not in compliance with the regulations.

The majority relies on the court's statement as support for its contention that a property right exists in the instant case. The majority also states that in *SuperValu Holdings, Inc. v. Jackson Ctr. Assoc., LP.*, 2006 WL 1843588, at *8 (Ohio Ct. App.), the Ohio Court of Appeals confirmed the property interest found by the court in *Stile*. For three reasons, I do not believe that *Stile* and *SuperValu* support the outcome reached by the majority.

First, the plaintiff in *Stile* had an application pending for a zoning certificate when the Zoning Commission amended the development plan. In fact, the court in *Stile* stated: "Under Ohio law, a property owner's right to an existing zoning classification vests upon the submission of an application for a building or zoning certificate." 115 F. Supp. 2d. at 865 n.21 (citing *Zaremba*, 616 N.E.2d at 571). This fact distinguishes the circumstances in *Stile* from those here, where Wedgewood had no application pending when the Trustees changed the rules.

That the court in *Stile* then discounted defendants' argument that plaintiff's property right "did not vest under *Zaremba* because he did not comply with all the legislative requirements for the procurement of a zoning certificate," *id.*, is inapposite here. The district court's citation of *Zaremba* shows it was not disregarding the application requirement of *Zaremba*, even assuming it could have done so.

Most simply put, the landowner in *Stile* was not, as Wedgewood does here, asserting it had a property right, *absent a pending application for a building or zoning certificate*, when the change in zoning occurred.

Second, though I agree with the majority that the Ohio Court of Appeals recognized the holding of *Stile* in *SuperValu Holdings*, I disagree with the majority's interpretation of this recognition.

The Ohio Court of Appeals simply distinguished *Stile*, stating:

---

115 F. Supp. 2d at 865 n.21 (internal quotation omitted).

> The principal case cited by appellant, *Stile,* is inapplicable. In *Stile*, a township zoning commission eliminated a "permitted use" in a Planned Development District where the plaintiff owned property. The plaintiff had intended to sell part of his property to an automobile dealership, but such a sale was not feasible following the elimination of "community/regional sales" as a "permitted use." In *Stile*, state action affected the plaintiff's property rights by restricting how the plaintiff could use his property. In this case, Union Township's enactment of its zoning amendments did not affect Supervalu's property rights. Specifically, the enactment of the amendments did not affect the validity or the enforceability of the restrictive covenants.

*SuperValu Holdings*, 2006 WL 1843588, at *4.

Although the court in *SuperValu* recognized, in passing, the property right identified in *Stile*, it did not mention *Zaremba*, or *Gibson*. Had the court in *SuperValu* interpreted *Stile* as broadly as the majority seems to envision – as overruling or distinguishing the *Zaremba/Gibson* requirement that property rights vest only on submission of an application for a zoning permit or certificate – one would expect at least a passing reference to these cases. This is particularly true with regard to *Gibson*, as it is an Ohio Supreme Court case and binding authority.

Third, and most importantly, were the decision of the district court in *Stile* as broad as the majority suggests, that holding would contradict binding Sixth Circuit law, as exemplified by and enunciated so clearly in *Experimental Holdings*, 503 F.3d at 520. To repeat what that court stated and so clearly, emphatically and unequivocally declared: "state procedural requirements cannot be the types of 'limits on discretion' that are sufficient to find a property interest. In order for limits on discretion to create property interests, they must be *substantive* limits on discretion."

So established and stated, this rule draws the proverbial bright line for all – landowners, developers and governmental bodies.

Because Wedgewood had no application pending at the time of the amendment, and because procedural limits on discretion cannot, under the law of Ohio and precedents of this Court, create a property interest, Wedgewood did not have a vested

property interest in any particular zoning classification. It, therefore, cannot establish a due process violation.

For these reasons, I respectfully dissent.